ROBERT F. JONES, JR., Plaintiff-Appellee, v. JESSE WHITE, Secretary of State, Defendant-Appellant.

Fourth District    No. 4—03—0850

Opinion filed August 23, 2004.

Lisa Madigan, Attorney General, of Chicago (Gary S. Feinerman, Solicitor General, and Carol A. Cera, Assistant Attorney General, of counsel), for appellant.

J. Randall Cox, of Feldman, Wasser, Draper & Benson, of Springfield, for appellee.

JUSTICE STEIGMANN delivered the opinion of the court:

Following an April 2002 hearing, defendant, Illinois Secretary of State Jesse White, denied plaintiff, Robert F. Jones, Jr.'s petition for reinstatement of his full driving privileges. In July 2002, Jones filed a complaint for administrative review; and following an August 2003 hearing, the circuit court reversed the Secretary's denial of Jones' petition to reinstate his full driving privileges.

The Secretary appeals the circuit court's order, and we reverse.

## I. BACKGROUND

In June 1987, Jones was arrested for driving under the influence of alcohol or drugs or both (DUI) (Ill. Rev. Stat. 1987, ch. 95$\frac{1}{2}$, par. 11—501) after he submitted to a Breathalyzer test that disclosed a blood-alcohol concentration of 0.17. In August 1987, Jones' driver's license was summarily suspended for a period of three months (Ill. Rev. Stat. 1987, ch. 95$\frac{1}{2}$, par. 11—501.1). In December 1987, Jones received court supervision for the June 1987 DUI offense.

In February 1992, Jones' Illinois driver's license was surrendered to another state. (The record does not show to which state Jones surrendered his license.) In July 1992, Jones was again arrested for DUI (625 ILCS 5/11—501(a)(4) (West 1992)) after he was stopped and refused to complete a Breathalyzer test. In February 1993, Jones was convicted of DUI and driving while his license was suspended.

In February 2002, Jones, who was then 47 years old and lived in Michigan, filed a petition, seeking reinstatement of his full driving privileges in Illinois and a formal hearing on his petition.

The evidence presented at the April 2002 hearing on Jones' petition showed the following. Jones testified that he received his first DUI after he drank "a lot" of 16-ounce beers at the Chicago Blues Festival. Prior to that arrest, Jones typically consumed "maybe a 12-pack [of beer] a week or a little more."

At the time of his second DUI arrest, Jones had been drinking beer and had taken Xanax (a benzodiazepine), which a physician had prescribed for him in 1998 for anxiety related to his self-described "horrible" marriage and work-related stress. Jones explained that his then-wife was violent and controlling, and he had been arrested 12 or 15 times for domestic abuse, although he was never convicted.

Jones also testified that from 1988 through July 1992, he took Xanax in increasing amounts and beyond the prescribed dosage. His prescribed dosage was one milligram, three times per day, but Jones was "probably taking somewhere between six and nine milligrams." At some point during that four-year period, he became aware that his Xanax use was going to affect him, and he did not want it to interfere with his work. (Since 1990, Jones had worked as an environmental health and safety manager for Washington Group or one of its predecessors.) Jones made numerous unsuccessful attempts to stop using Xanax on his own. He explained that he would stop taking Xanax on a Friday morning, and by the end of the day, he would become "very irritable and jumpy." By Saturday, he would be "bouncing off the wall," and by Sunday, he "would have some hallucinations and actually lose motor control." For instance, if Jones wanted to pick up a cup of coffee, he could not make his arm pick up the cup even though he could see it sitting on the table. When that occurred, he had his then-wife go to the pharmacy, where the "doctors always had plenty of refills on the books" for him, and get a prescription refilled. Jones acknowledged that he "knew [he] couldn't get off of [Xanax]," and he eventually realized he had a problem and wanted to get treatment.

One or two weeks prior to his July 1992 DUI arrest, Jones had arranged to complete inpatient alcohol- and drug-abuse treatment at Hazelden Foundation in Center City, Minnesota. Because Jones was going to be at Hazelden for about one month, he and his then-wife took a weekend trip before he was to be admitted. Jones explained that they were on their way home from a casino in the "Quad cities" when he was arrested for his second DUI.

Later in July 1992, Jones was admitted to Hazelden, where he completed a 28-day inpatient alcohol- and drug-abuse treatment program. His treatment program addressed both his alcohol and Xanax abuse. When he was first admitted to Hazelden, Jones did not see himself as a substance abuser because Xanax was a prescribed medica-

tion. After completing the treatment program, he realized that he was a substance abuser. For about one year following his successful completion of the program, Jones attended aftercare meetings with a counselor. His then-wife urged him to drink and became angry when he did not. Jones also discovered that she had "quite the cocaine problem," and she wanted him to use cocaine with her. Jones refused, and they later divorced.

In September 1992, Jones' driver's license was summarily suspended for two years (625 ILCS 5/11—501.1 (West 1992)). In February 1993, Jones was convicted of both DUI and driving with a suspended Illinois driver's license (625 ILCS 5/6—303(a) (West 1992)).

In March 1993, the Secretary revoked Jones' Illinois driver's license and driving privileges, pursuant to section 6—205(a)(2) of the Illinois Vehicle Code (Code) (625 ILCS 5/6—205(a)(2) (West 1992)).

Jones also testified that he had not taken Xanax since July 1992. From late July 1992 until sometime in 1995 or 1996, he did not drink alcohol because he had taken the Hazelden treatment program "very seriously." Around 1996, he began drinking "socially." His drinking had not interfered with his driving or ability to work. Jones explained that his current wife does not drink, and they spend their time on non-drinking-related activities. He acknowledged that he currently drinks about a six-pack of beer per week, but not consistently. Occasionally when Jones gets home from work, he drinks two or three beers.

Jones further testified that he suffered ailments after working as a demolition safety manager at the World Trade Center "ground zero" site. He had taken "as many as ten or fifteen medications at a time" for the ailments. He currently was taking four prescribed medications for a reactive airway disorder and one blood-pressure-regulating medication.

The hearing officer considered an "alcohol and drug evaluation uniform report" regarding Jones that was prepared in mid-March 2002 by Jamie Link, a substance-abuse evaluator employed by Solutions Counseling and DUI Services in Springfield. The uniform report indicated, in pertinent part, as follows. Jones told Link that in the year prior to his 1992 DUI arrest, he shared a 12-pack of beer per week and a six-pack of beer per weekend. On the day of his July 1992 DUI arrest, which occurred at 5 p.m., he had consumed four draft beers between noon and 4 p.m. He also had taken six to eight milligrams of Xanax that day. Link noted that Jones' consumption of beer and Xanax led to his 1992 DUI arrest. Link also noted that during the 12-month period prior to his 1992 DUI arrest, Jones had repeatedly used substances "in situations in which it [was] physically hazard-

ous." Link also noted that during that same 12-month period, Jones had the following symptoms of substance dependency: (1) tolerance—that is, either (a) a need for markedly increased amounts of a substance to achieve intoxication or the desired effect or (b) a markedly diminished effect with continued use of the same amount of a substance; and (2) withdrawal—that is, either (a) the characteristic withdrawal symptoms for a substance or (b) the taking of the same or a closely related substance to relieve or avoid withdrawal symptoms. Jones also told Link that he had not used drugs since beginning treatment at Hazelden in July 1992.

Link classified Jones as a Level II (significant risk for relapse). She recommended that Jones (1) complete a minimum of 10 hours of DUI-risk education and a minimum of 20 hours of substance-abuse treatment and (2) participate in recommended aftercare activities.

Later in March 2002, Link sent the Secretary a letter, indicating, in pertinent part, as follows: (1) Jones' Level II classification was based on (a) his destructive personal life, including a violent relationship with his former wife, and (b) a stressful job that led to Jones' increased use of Xanax over a four-year period; (2) his inpatient treatment at Hazelden satisfied Link's recommendation that Jones complete DUI-risk education and substance-abuse treatment; (3) since his inpatient treatment, Jones had exhibited self-control and more healthy decisionmaking and life skills; (4) Jones had "continued to use alcohol since 1992, in a safe and responsible manner"; and (5) in Link's opinion, Jones did not "appear to show signs of being dependent on substances" and the Secretary might consider restoring Jones' driving privileges.

Jones further testified that he did not know why Link classified him as a Level II (significant risk). He also stated that "a year or so back," he completed a substance-abuse evaluation in Oregon. According to Jones, after consulting with the Secretary, the Oregon evaluator stated as follows: " 'Well, we are going to classify him this [(a Level III high risk dependent)]. That I have to classify him this, but I don't feel that it is a problem, but according to [Illinois] rules, this is what I have to put down.' " The following colloquy then took place between Jones, his attorney, and the attorney for the Secretary:

"[JONES' ATTORNEY]: It's my—my understanding from talking to the [Oregon] evaluator about it is that potentially—and I alluded to this earlier, you know, [Jones] should be a [L]evel [III (high risk dependent)]. Her point is, he's not dependent because he's had this long period of non-problematic use of alcohol. And I don't know enough about this to be able to—.

[SECRETARY'S ATTORNEY]: But [Jones] is chemically dependent.

> Q. [SECRETARY'S ATTORNEY:] You are chemically dependent[?]
>
> [JONES' ATTORNEY]: No, he's not.
>
> Q. [SECRETARY'S ATTORNEY:] You are not chemically dependent[?]
>
> [JONES' ATTORNEY]: No.
>
> Q. [SECRETARY'S ATTORNEY:] You are not chemically dependent on [X]anax?
>
> A. [JONES:] Yes, I was.
>
> Q. [SECRETARY's ATTORNEY:] That's chemically dependent?
>
> A. [JONES:] Yes."

Jones then acknowledged that during his inpatient treatment at Hazelden, he had not learned that a person can be cured of a chemical dependency. Instead, at Hazelden, he was taught that "there is no such thing as a cure." Jones further acknowledged that if he were to use Xanax or another benzodiazepine, he would "almost definitely end up having a problem similar to the one he had before." Although Jones did not believe that alcohol use can be totally segregated from the use of other chemical substances, he believed that he suffered an actual addiction to Xanax.

The hearing officer also considered Jones' January 1998 affidavit, which he had submitted as part of an out-of-state application to reinstate his full driving privileges. In that affidavit, Jones averred, in pertinent part, that prior to his 1992 DUI arrest, he usually drank six cases of beer per month. The hearing officer further considered a November 10, 2000, letter from the Hazelden health information department, which indicated that from July 21, 1992, through August 18, 1992, Jones was treated as an inpatient for "chemical dependency."

Following the April 2002 hearing, the hearing officer issued a written decision recommending that Jones' petition for reinstatement of his full driving privileges be denied. The hearing officer specifically found that the evidence submitted at the April 2002 hearing did not support Link's classification of Jones as a Level II (significant risk) for the following reasons: (1) Jones' treatment documentation indicated that he received inpatient treatment for "chemical dependency"; (2) Jones testified that he did not know why he was classified as a Level II (significant risk) when he previously had been classified as a Level III (high risk dependent); (3) Jones admitted his chemical dependency upon, and inability to quit taking, Xanax; and (4) Jones himself clearly identified three symptoms of substance abuse that would classify him as a Level III (high risk dependent)—namely, (a) a marked tolerance, in that Jones (i) had a need for markedly increased amounts of the substance to achieve intoxication or the desired effect or (ii)

experienced a markedly diminished effect with continued use of the same amount of the substance; (b) characteristic withdrawal symptoms; and (c) based on Jones' testimony as to his several attempts to quit his Xanax abuse, the persistent desire or one or more unsuccessful efforts to cut down or control substance use. The hearing officer recommended that Jones return to his evaluator to address his proper classification and present such evidence at his next requested hearing.

The hearing officer found that Jones should have been classified as a Level III (high risk dependent), and as a person who should have been so classified, Jones was required to (1) remain abstinent from both alcohol and drugs for a minimum of 12 months and document that abstinence and (2) have an established support system. The hearing officer further found that Jones had failed to provide evidence of his abstinence and prove that he had an established support system.

The hearing officer also found that Jones failed to prove that he would (1) be a safe and responsible driver and (2) not endanger the public safety and welfare. In so finding, the hearing officer noted inconsistencies in Jones' reported alcohol use prior to his 1992 DUI arrest. In particular, during the March 2002 evaluation, Jones told Link that he typically shared a 12-pack of beer during the week and a six-pack of beer over the weekend. However, Jones' January 1998 affidavit indicated that prior to his 1992 DUI arrest, he typically drank six cases of beer per month (36 beers per week). The hearing officer recommended that Jones should return to his evaluator to address the inconsistency and present an accurate and complete chronological history of his drug and alcohol use at his next requested hearing.

In May 2002, the Secretary adopted the hearing officer's findings and recommendations and denied Jones' requested relief.

In July 2002, Jones filed a complaint in the circuit court, seeking administrative review of the Secretary's May 2002 decision. Following an August 2003 hearing, the court reversed the Secretary's denial of Jones' petition to reinstate his full driving privileges. The court later granted the Secretary's request to stay enforcement pending appeal.

This appeal followed.

## II. THE SECRETARY'S DENIAL OF JONES' PETITION

The Secretary argues that his May 2002 decision denying Jones' petition was not against the manifest weight of the evidence. We agree.

■ Driving a motor vehicle on public roads is a privilege and not a right. "The public interest in curbing the epidemic number of deaths and injuries attributable to drunk driving by keeping unsafe drivers off the streets outweighs the interests of convicted drunk drivers in

regaining their driving privileges." *Grams v. Ryan*, 263 Ill. App. 3d 390, 395, 635 N.E.2d 1376, 1380 (1994). "Once driving privileges are revoked, their restoration is not automatic." *Mohr v. White*, 324 Ill. App. 3d 643, 647, 756 N.E.2d 434, 437 (2001).

Under section 6—208(b) of the Code, the Secretary shall not reinstate full driving privileges until he is satisfied that doing so will not endanger the public safety or welfare (625 ILCS 5/6—208(b) (West 2002)). The Secretary has promulgated regulations that set forth the requirements that a petitioner must meet before his driving privileges are reinstated. 92 Ill. Adm. Code §§ 1001.400 through 1001.490 (Conway Greene CD-ROM March 2002). Among the factors the Secretary may consider in deciding whether to reinstate a petitioner's driving privileges are the following: (1) the petitioner's age and total driving record; (2) the number of years the petitioner has been licensed to drive; (3) whether the petitioner has driven while his license was suspended or revoked; (4) the duration of the petitioner's present employment; (5) the number, severity, and frequency of accidents; (6) the frequency, type, and severity of traffic violations; (7) the petitioner's efforts at rehabilitation or reform of past driving practices; (8) the petitioner's demeanor at the administrative hearing; (9) the credibility of the petitioner and other witnesses at the hearing; (10) the credibility of and weight given to the petitioner's documentary evidence; and (11) the petitioner's total driving record. 92 Ill. Adm. Code § 1001.430(c) (Conway Greene CD-ROM March 2002).

In addition, to be entitled to reinstatement of driving privileges, a petitioner must prove that (1) he does not have a current alcohol or drug problem; (2) he is at low or minimal risk to repeat past abusive behaviors and operate a vehicle while under the influence of alcohol or drugs; (3) he has complied with all other standards as specified in the regulations; and (4) the granting of driving privileges will not endanger public safety and welfare. 92 Ill. Adm. Code § 1001.440(b) (Conway Greene CD-ROM March 2002); see *Grams*, 263 Ill. App. 3d at 396, 635 N.E.2d at 1380.

A petitioner who has been classified as a Level II (significant risk) must document successful completion of (1) an alcohol- or drug-risk education course and (2) any recommended treatment. 92 Ill. Adm. Code § 1001.440(b)(2) (Conway Greene CD-ROM March 2002). A petitioner who has been classified as a Level III (high risk dependent) must document (1) 12 months of abstinence (based on evidence from three independent sources); (2) completion of treatment; (3) compliance with any recommendations of his evaluator or treatment provider; and (4) an ongoing support system. 92 Ill. Adm. Code § 1001.440(b)(3) (Conway Greene CD-ROM March 2002).

In determining whether a person's driving privileges should be reinstated, the hearing officer may consider any alcohol and drug evaluations. However, such evaluations "are not dispositive of the issues and are not the sole factor to be considered." *O'Neil v. Ryan*, 301 Ill. App. 3d 392, 399, 703 N.E.2d 511, 516 (1998). See *Berry v. Edgar*, 192 Ill. App. 3d 455, 460, 548 N.E.2d 575, 578 (1989) (a favorable alcohol or drug evaluation does not command restoration of driving privileges; "[t]o do so would make the requirement of a formal hearing worthless, and the discretion to be exercised by the Secretary nothing more than a mere rubber stamp").

The person seeking reinstatement of full driving privileges has the burden of proving by clear and convincing evidence that he is entitled to be granted those privileges. *Grams*, 263 Ill. App. 3d at 396, 635 N.E.2d at 1380.

Contrary to the apparent suggestion in Jones' brief that this court may review *de novo* the Secretary's decision, we may not overturn an administrative decision unless the administrative agency exercised its authority in an arbitrary or capricious manner or its decision was against the manifest weight of the evidence. *O'Neil*, 301 Ill. App. 3d at 400, 703 N.E.2d at 517. If the record contains any evidence that fairly supports the agency's decision, that decision is not against the manifest weight of the evidence. *Grams*, 263 Ill. App. 3d at 396, 635 N.E.2d at 1380. An administrative agency's decision is not against the manifest weight of the evidence merely because this court might have decided the case differently in the first instance. *Gumma v. White*, 345 Ill. App. 3d 610, 615-16, 803 N.E.2d 130, 135 (2003); see also *Conklin v. Ryan*, 242 Ill. App. 3d 32, 37, 610 N.E.2d 751, 755 (1993) ("A reviewing court does not reweigh the evidence or make an independent review of the facts, but rather its function is to ascertain whether the final decision of the administrative body is just and reasonable in light of the evidence presented"). In addition, we review the administrative agency's decision, not the circuit court's. *Bruce v. White*, 344 Ill. App. 3d 795, 799, 801 N.E.2d 581, 584 (2003).

■ In this case, the evidence showed the following: (1) Jones had received inpatient treatment for "chemical dependency"; (2) Jones acknowledged that he was chemically dependent upon Xanax and no cure exists for a chemical dependency; (3) if Jones used Xanax or another benzodiazepine, he would "almost definitely" experience the same sort of addiction he previously suffered; (4) Jones did not know why Link had classified him as a Level II (significant risk); (5) about one year before the April 2002 hearing, an Oregon evaluator had classified Jones as a Level III (high risk dependent); (6) Jones had three symptoms of substance abuse that would classify him as a Level III

(high risk dependent)—namely, a marked tolerance, characteristic withdrawal symptoms, and one or more unsuccessful attempts to control substance abuse; and (7) neither the March 2002 uniform report nor Link's letter to the Secretary made mention (a) as to why Jones' diagnosis of chemical dependency was wrong or should be ignored or (b) of the prior Oregon evaluation.

Based on that evidence, the hearing officer found that (1) Jones was misclassified as a Level II (significant risk); (2) Jones should have been classified as a Level III (high risk dependent); and (3) Jones had failed to prove by clear and convincing evidence that he satisfied the requirements of an individual classified as a Level III—that is, abstinence and an established support system. The hearing officer also found that based on the unresolved inconsistencies that existed regarding Jones' past alcohol use, Jones had failed to prove by clear and convincing evidence that he would be a safe and responsible driver and not endanger the public safety and welfare. The hearing officer thus recommended (and the Secretary later adopted the hearing officer's recommendation) that Jones' full driving privileges not be reinstated.

Having carefully reviewed the evidence under the appropriate standard of review (as we must), we conclude that it fairly supports the Secretary's decision. We thus further conclude that the Secretary's decision was not against the manifest weight of the evidence and was "just and reasonable in light of the evidence presented." *Conklin*, 242 Ill. App. 3d at 37, 610 N.E.2d at 755.

In so concluding, we reject Jones' contention that our decision is controlled by this court's decision in *Mohr*, 324 Ill. App. 3d 643, 756 N.E.2d 434. That case is factually distinguishable. In *Mohr*, the plaintiff (Mohr) was twice convicted of DUI, once in 1982 and again in 1989. *Mohr*, 324 Ill. App. 3d at 645, 756 N.E.2d at 435. Following his 1989 DUI arrest, Mohr stopped drinking. In 1994 and 1999, he was evaluated and classified each time as a Level II (significant risk). *Mohr*, 324 Ill. App. 3d at 645, 756 N.E.2d at 435-36. At the hearing on his April 1999 petition for reinstatement of driving privileges, Mohr submitted the 1994 and 1999 evaluations. He also testified that (1) he quit drinking because once he starts, he cannot stop; and (2) although he had never been diagnosed as an alcoholic, he believed he was one. *Mohr*, 324 Ill. App. 3d at 645, 756 N.E.2d at 436. The hearing officer recommended that Mohr's petition be denied because the facts supported a Level III classification (high risk dependent), in light of Mohr's admission that he was an alcoholic and his belief that he could not return to controlled drinking in the future. The Secretary later adopted the hearing officer's findings and recommendation. *Mohr*, 324 Ill. App. 3d at 646, 756 N.E.2d at 437.

The circuit court reversed the Secretary's decision, and this court agreed with the circuit court. *Mohr*, 324 Ill. App. 3d at 647-48, 756 N.E.2d at 437-38. In so concluding, we noted that (1) Mohr had done everything he was required to do for alcohol evaluation and complied with the Secretary's rules; and (2) Mohr's "overly critical self-analysis" did not make him a Level III risk. *Mohr*, 324 Ill. App. 3d at 648, 756 N.E.2d at 438.

Unlike in *Mohr*, in this case, the hearing officer did not find that Jones had been misclassified as a Level II (significant risk) based only on Jones' self-analysis. Instead, the hearing officer based his finding, in part, on the existence of the prior Oregon evaluation that classified Jones as a Level III (high risk dependent), Link's failure to take into account the Oregon evaluation, Jones' diagnosis as a chemically dependent individual, and Jones' inpatient treatment for chemical dependency.

## III. CONCLUSION

For the reasons stated, we reverse the trial court's judgment.

Reversed.

KNECHT, P.J., concurs.

JUSTICE TURNER, specially concurring:

I concur with the majority's decision to reverse the trial court. Here, the Oregon evaluation conflicted with the Illinois evaluation, and thus, in my view, Jones did not present clear and convincing proof he would be a safe and responsible driver. Accordingly, the Secretary's decision was not against the manifest weight of the evidence. However, I write separately to note my agreement with Jones' argument the hearing officer had no authority to reclassify him as a Level III (high risk dependent).